# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| **WILLIAM J. MULLINS,** ) | |
|    Plaintiff ) | |
| ) | Civil Action No. 2:19cv00020 |
| v. ) | |
| ) | **MEMORANDUM OPINION** |
| **ANDREW SAUL,**[1] ) | |
| **Commissioner of Social Security,** ) | By: PAMELA MEADE SARGENT |
|    Defendant ) | United States Magistrate Judge |

## *I. Background and Standard of Review*

Plaintiff, William J. Mullins, ("Mullins"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may

---

[1] Andrew Saul became the Commissioner of Social Security on June 17, 2019; therefore, he is automatically substituted as the defendant in this case pursuant to Fed. R. Civ. P. Rule 25(d).

be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "'substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Mullins protectively filed his application for DIB on November 3, 2015, alleging disability as of November 5, 2014, based on problems with his left shoulder, arm and hand; problems with both knees; depression; anxiety; and difficulty concentrating. (Record, ("R."), at 12, 186-87, 204, 239.) The claim was denied initially and upon reconsideration. (R. at 114-22.) Mullins then requested a hearing before an administrative law judge, ("ALJ"). (R. at 123-24.) The ALJ held a hearing on January 11, 2018, at which Mullins was represented by counsel. (R. at 31-61.)

By decision dated April 11, 2018, the ALJ denied Mullins's claim. (R. at 12-24.) The ALJ found that Mullins met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2019. (R. at 15.) The ALJ found that Mullins had not engaged in substantial gainful activity since November 5, 2014, the alleged onset date.[2] (R. at 15.) The ALJ determined that Mullins had severe impairments, namely status-post residuals from a left fifth finger degloving[3] injury; degenerative joint disease in the left shoulder and knee; migraines; chronic pain; myofascial pain; post-traumatic stress disorder, ("PTSD"); depression; and anxiety, but he found that Mullins did not have an impairment or combination of

---

[2] Therefore, Mullins must show that he was disabled between November 5, 2014, the alleged onset date, and April 11, 2018, the date of the ALJ's decision, in order to be eligible for benefits.

[3] Degloving, also called avulsion, is a type of severe injury that happens when the top layers of the skin and tissue are ripped from the underlying muscle, connective tissue or bone. *See* https://www.healthline.com/health/degloving (last visited Aug. 18, 2020).

impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15.) The ALJ found that Mullins had the residual functional capacity to perform light[4] work that required no more than frequent balancing and stooping; that required no more than occasional pushing and pulling with the left upper and lower extremities, use of foot and hand controls, reaching in all directions or handling on the left side, climbing of ramps and stairs, kneeling, crouching, crawling, exposure to moving mechanical parts, unprotected heights, temperature extremes, vibration and loud noise; that did not require reaching overhead or fingering on the left side or climbing ladders or scaffolds; that required him to perform no more than simple, routine tasks and to make simple work-related decisions; and that required only occasional changes in a routine work setting. (R. at 17.) The ALJ found that Mullins was unable to perform his past relevant work. (R. at 23.) Based on Mullins's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Mullins could perform, including the jobs of an usher, a rental consultant and a conveyor line bakery worker. (R. at 23-24.) Thus, the ALJ concluded that Mullins was not under a disability as defined by the Act and was not eligible for DIB benefits. (R. at 24.) *See* 20 C.F.R. § 404.1520(g) (2019).

After the ALJ issued his decision, Mullins pursued his administrative appeals, (R. at 181, 265-67), but the Appeals Council denied his request for review. (R. at 1-5.) Mullins then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2019). This case is before this court on Mullins's motion for

---

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2019).

summary judgment filed October 10, 2019, and the Commissioner's motion for summary judgment filed November 4, 2019.

## *II. Facts[5]*

Mullins was born in 1964, (R. at 186), which, at the time of the ALJ's decision, classified him as a "person closely approaching advanced age" under 20 C.F.R. § 404.1563(d). He has a high school education and specialized job training as a heavy equipment operator. (R. at 205.) Mullins has past work experience as a coal miner and a machine operator. (R. at 54-55.)

Mark Hileman, a vocational expert, also was present and testified at Mullins's hearing. (R. at 54-60.) Hileman testified that all employment would be precluded if a hypothetical individual would be off task 15 percent of an eight-hour workday in addition to normal breaks. (R. at 55.) Hileman testified that a hypothetical individual of Mullins's age, education and work history, who had the residual functional capacity to perform light work, who could occasionally push and pull with his left lower and upper extremities, use foot controls with his left lower extremity and use hand controls with his left upper extremity; who could never reach overhead with the left upper extremity, but could occasionally reach in all other directions with the left upper extremity; who could occasionally handle, but never finger, with the left upper extremity; who could occasionally climb ramps and stairs, kneel, crouch and crawl; who could frequently balance and stoop; who could never climb ladders or scaffolds; who could have occasional exposure to hazards such as moving mechanical parts or unprotected heights; and who could occasionally tolerate exposure to temperature extremes, vibration and loud noise

---

[5] Based on the court's findings regarding Mullins's argument related to his physical residual functional capacity, the court will focus on the facts related to Mullins's physical impairments and accompanying limitations.

could not perform Mullins's past work. (R. at 55-56.) He stated that such an individual could perform work that existed in significant numbers, including jobs as an usher, a rental consultant and a conveyor line bakery worker. (R. at 56-57.) Hileman then was asked to consider the same hypothetical individual, but who would be limited to performing simple, routine tasks, making simple work-related decisions and responding appropriately to occasional changes in a routine work setting. (R. at 57.) He stated that this individual could perform the jobs previously identified. (R. at 57.)

Hileman stated that, should the hypothetical individual be limited to sitting two to four hours and standing one hour in an eight-hour workday, he could not perform the jobs previously identified. (R. at 57-58.) He stated that the rental consultant and usher jobs would be eliminated if the individual had to avoid bilateral above-head reaching activity and bilateral operation of foot pedals; and if he could not crouch, crawl, squat, kneel, climb stairs or work around unprotected heights. (R. at 58.) He stated that these jobs would be eliminated, as they potentially require occasional crouching. (R. at 58.) Hileman stated that all jobs would be eliminated should the individual's ability to concentrate be significantly diminished. (R. at 60.)

In rendering his decision, the ALJ reviewed medical records from C. Marcus Cooper, Ph.D., a state agency psychologist; Richard Luck, Ph.D., a state agency psychologist; Dr. Tony Constant, M.D., a state agency physician; Howard S. Leizer, Ph.D., a state agency psychologist; Dr. James Darden, M.D., a state agency physician; Norton Community Hospital; Buchanan General Hospital; University of Kentucky; Johnson City Medical Center; Bristol Regional Medical Center; UK Cosmetic Surgery Associates; Haysi Clinic; Mountain States Medical Group; East Tennessee Acupuncture Clinic; Dr. D. Kevin Blackwell, D.O.; Pain Medicine

Associates, P.C.; Dr. David E. Dahl, M.D.; Dr. Walid Azzo, M.D.; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Appalachian Rehabilitation Professionals, P.C.; and Bristol Regional Medical Center – The Hand Center, ("The Hand Center").

Mullins was involved in coal mining accident on November 5, 2014, which resulted in a left-hand deep skin avulsion injury and multiple reconstruction procedures on the little finger of his nondominant hand. (R. at 284-85, 290-361, 365-99, 401-40, 465-70, 499-501.) On January 9, 2015, Dr. Brian Rinker, M.D., a physician with UK Cosmetic Surgery Associates, released Mullins to return to light-duty work, with no lifting of more than two pounds on the left and no restrictions on the right. (R. at 360.) Mullins underwent extensive hand therapy for range of motion, but his small finger was very stiff. (R. at 361, 466-67, 518-744.) On April 1, 2015, a nerve conduction study was "mildly abnormal." (R. at 916-18.) Mullins had interruption of the sensory fibers in the distal ulnar distribution at the digital nerve level to the little finger and partially to the ring finger, and motor nerve function was intact. (R. at 918.) By June 2015, Mullins reported that he wanted to return to work, (R. at 487), but his employer told him that "there was not a place for him." (R. at 690.) Mullins reported that he was doing lots of chores, including painting and moving furniture; his hand managed "pretty well" and was only "a little stiff." (R. at 667.) Mullins reported to his occupational therapist that he was "doing pretty much everything at home that he needs to." (R. at 677.) In July 2015, Mullins had passive range of motion in his little finger, intact sensation and full active range of motion of the shoulder, elbow and wrist. (R. at 485.) In August and September 2015, Mullins showed limited range of motion in his little and ring fingers on his left hand, but he had intact sensation. (R. at 481, 483.) His surgeon, Dr. Todd Horton, M.D., released him to return to work with no heavy lifting, gripping, grasping or pushing and pulling with the left hand. (R. at 483,

507.)

Mullins treated with Dr. David E. Dahl, M.D., from September 2015 through September 2017 for left upper extremity pain and ulnar neuropathy. (R. at 780-93, 888-906, 1301-06.) During this time, Mullins underwent numerous nerve blocks, which he reported greatly improved his pain. (R. at 781-82, 785-90, 897-902.) Mullins also reported that he was able to manage his pain with medication, acupuncture treatment and physical therapy, which allowed him to be independent in his activities of daily living. (R. at 780, 783, 785, 789, 792, 890-91, 904, 1301, 1303-04.) Dr. Dahl routinely reported that Mullins had significant allodynia[6] in his ulnar nerve distribution. (R. at 789, 888, 891-93, 895, 903, 1301-02.) Dr. Dahl diagnosed upper extremity neuropathy; complex regional pain syndrome, type 2; ulnar neuropathy; migraine headaches, secondary to trauma; chronic pain syndrome; and anxiety/PTSD related to trauma. (R. at 888.)

On October 21, 2015, Mullins began acupuncture treatment of his left hand, and continued treatment through June 2017. (R. at 928-62, 964, 974-80, 1296-98.) Scott Fitzpatrick, Dipl. O.M., RES, an acupuncturist, reported that, due to Mullins's degloving injury, he would require lifelong comprehensive medical care. (R. at 964.) He opined that Mullins's ability to work had been profoundly impaired due to neuromuscular damage, which prevented him from having normal function and control of his left hand and arm. (R. at 964.) Fitzpatrick opined that Mullins did not have the ability to maintain grip strength or any fine motor control. (R. at 964.) He reported that acupuncture treatments gave Mullins immediate, temporary relief of his pain.[7] (R. at 857, 964.) Fitzpatrick stated that Mullins would require a

---

[6] Allodynia is pain that results from a non-injurious stimulus to the skin. *See* STEDMAN'S MEDICAL DICTIONARY, ("Stedman's"), 30 (1995).

[7] Mullins routinely reported pain relief with treatment. (R. at 928-31, 933, 935-48, 950-

-7-

long-term care plan, including acupuncture and medical management, along with possible future surgeries. (R. at 964.)

On November 16, 2015, a nerve conduction study showed abnormal findings of the ulnar nerve in Mullins's left arm. (R. at 920-21.) Mullins underwent occupational therapy from December 2015 through June 2017 at The Hand Center. (R. at 1021-1295.) It was noted that, although Mullins had persistent pain, he had improved hand range of motion and strength and increased flexibility of the ring finger and small finger. (R. at 1294.) On January 4, 2016, Dr. Horton performed a left ulnar decompression procedure at the wrist and elbow, (R. at 756-58), and subsequent left ulnar nerve revision, decompression and anterior transposition with neurolysis was performed on November 4, 2016. (R. at 1004-05.) In May 2016, Mullins reported performing activities of daily living with modified independence. (R. at 1066.) He stated that he was limited in his ability to perform heavier household tasks due to pain and that driving was uncomfortable. (R. at 1066.) It was noted that Mullins's distal ulnar nerve gliding at the wrist and elbow were moderately limited. (R. at 1066.)

In June 2016, Mullins had some decreased hypersensitivity at the elbow, but he continued to have proximal to distal nerve pain and discomfort that significantly limited his functional use of his left arm. (R. at 1073.) While Mullins had lessened hypersensitivity in the posterior elbow for light touch, he could not tolerate any pressure. (R. at 1073.) In July 2016, Mullins complained of continued numbness in the ring and small fingers and tenderness at the left cubital tunnel area. (R. at 1085.) In May 2017, Mullins reported that, while trying to pinch, his hand was moving a little better and his thumb felt a little stronger, but he still could not open

---

51, 955-56, 959-62, 974-75, 977-80, 1298.)

a Ziploc bag. (R. at 1236.) In May and June 2017, although Mullins had normal to strong grip strength in his right hand, his grip and tip pinch strength were weak in his left hand. (R. at 1228, 1233-34, 1239-40.) It also was noted that Mullins had a limited ability to grip due to pain. (R. at 1294.)

On February 7, 2016, Dr. D. Kevin Blackwell, D.O., examined Mullins at the request of Disability Determination Services. (R. at 769-74.) Dr. Blackwell's examination revealed that Mullins was in no acute distress; he had good mental status; his affect, thought content and general fund of knowledge were intact; he could not squat; he had tenderness to the patella with compression testing; he had decreased sensation of the fourth and fifth digits of his hands; his gait was symmetrical and balanced; his shoulder and iliac crest heights were good and equal bilaterally; his upper and lower joints had no effusion or deformities; his upper and lower extremities were normal for size, shape, symmetry and strength; he had good grip strength at 5/5 and equal bilaterally; his fine motor movement and skill activities of the hands were normal; his reflexes in the upper and lower extremities were good and equal bilaterally at 4/4; and he had intact proprioception. (R. at 770-71.) Dr. Blackwell diagnosed elevated blood pressure; bilateral knee pain; bilateral shoulder pain; neck pain; and depression and anxiety, by history. (R. at 771.)

Dr. Blackwell opined that Mullins could occasionally lift items weighing 20 pounds and frequently lift items weighing 10 pounds; he could sit two to four hours with positional changes every 15 minutes; stand up to one hour with positional changes every 15 minutes; he should avoid above-reach activities with both arms; he could not perform foot pedal operation; he could not crouch, crawl, work at unprotected heights, squat or kneel; he could not climb stairs repetitively or continuously; and he had no limitation of hand usage, including fine motor movement and skill activities of the hands. (R. at 771.)

On February 10, 2016, Dr. Tony Constant, M.D., a state agency physician, completed a medical assessment, indicating that Mullins had the residual functional capacity to perform light work. (R. at 88-90.) He found that Mullins could never push and/or pull with his left upper extremity and only occasionally push and/or pull with his left lower extremity. (R. at 88.) Dr. Constant found that Mullins could frequently balance and stoop; occasionally climb ramps and stairs, kneel, crouch and crawl; and never climb ladders, ropes or scaffolds. (R. at 88-89.) He opined that Mullins could occasionally reach in front and/or laterally and handle with his left upper extremity and never reach overhead or finger with his left upper extremity. (R. at 89.) No visual or communicative limitations were noted. (R. at 89.) Dr. Constant found that Mullins should avoid concentrated exposure to extreme cold, noise, vibration, fumes, odors, dusts, gases, poor ventilation and hazards, such as machinery and heights. (R. at 89-90.)

On April 20, 2016, Fitzpatrick reported that Mullins would require lifelong comprehensive medical care and did not have a good prognosis of healing. (R. at 857.) He stated that Mullins's ability to work was impaired due to neuromuscular damage, which prevented him from having normal function and control of his left hand and arm. (R. at 857.)

On May 12, 2016, Dr. James Darden, M.D., a state agency physician, completed a medical assessment, indicating that Mullins had the residual functional capacity to perform light work. (R. at 107-109.) He found that Mullins could never push and/or pull with his left upper extremity and only occasionally push and/or pull with his left lower extremity. (R. at 107-08.) Dr. Darden found that Mullins could frequently balance and stoop; occasionally climb ramps and stairs, kneel, crouch and crawl; and never climb ladders, ropes or scaffolds. (R. at 108.) He opined that Mullins was limited in his ability to reach in any direction,

including overhead, to handle, to finger and to feel with his left upper extremity. (R. at 108.) No visual or communicative limitations were noted. (R. at 109.) Dr. Darden found that Mullins should avoid concentrated exposure to temperature extremes, noise, vibration and hazards, such as machinery and heights. (R. at 109.)

On June 20, 2017, Dr. Walid Azzo, M.D., Ph.D., an orthopedic surgeon, performed an independent medical examination in connection with Mullins's worker's compensation claim. (R. at 990-94.) Examination revealed full range of motion of Mullins's cervical spine, right shoulder, hips, knees and ankles; he had limited range of motion of his left shoulder; he had normal range of motion, motor strength and sensation of both elbows with no deficits noted; his left wrist showed no swelling, point tenderness and normal range of motion; he had decreased range of motion of the ring and little fingers; his grip strength on the left was difficult to test due to subjective pain; he had normal sensation in both legs; and normal gait (R. at 991-92.) Dr. Azzo diagnosed left fifth finger degloving injury; distal ulnar neuropathy; myofascial pain of the left hand and forearm; complex regional pain syndrome; left shoulder arthritis and impingement syndrome; anxiety; a coping disorder; and PTSD. (R. at 993.) He opined that Mullins had a 10 percent whole person disability rating and 17 percent upper extremity disability rating. (R. at 994.) Dr. Azzo found that Mullins was unable to return to his job as a coal miner, but he could return to work that did not require lifting of items weighing more than five pounds with his left upper extremity. (R. at 994.)

On July 27, 2017, Dr. Horton opined that Mullins had reached maximum medical improvement. (R. at 982.) He reported that Mullins's combined digital impairment for the left hand was 23 percent; his upper extremity impairment was 34 percent; and his whole-body impairment was 20 percent. (R. at 996.) Dr. Horton considered these impairments to be permanent. (R. at 996.) He found that Mullins

should not perform tasks that required lifting or carrying of items weighing more than two pounds with his left arm; that he should not lift items below or above shoulder level weighing more than two pounds with his left arm; that he should not push or pull items weighing more than two pounds with his left arm; that required him to climb ladders or use his left hand for forceful grasping; and that required more than occasional use of his left hand, but he indicated no right-arm or hand limitations. (R. at 982, 996, 1001.) Dr. Horton noted that these restrictions were permanent. (R. at 982, 996-97.)

In September 2017, Dr. Dahl reported that Mullins had an appropriate and euthymic mood; he had significant allodynia over the left elbow, forearm and pinky finger in the ulnar nerve distribution; and he ambulated with an unencumbered gait. (R. at 1301.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2019). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2019).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the

claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Mullins argues that the ALJ erred by improperly determining his residual functional capacity. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-6.) Mullins argues that the ALJ erred by rejecting the opinions of Drs. Blackwell, Azzo and Horton and psychologist Lanthorn, and by giving controlling weight to the opinions of the state agency consultants. (Plaintiff's Brief at 6.) Mullins contends that the state agency consultants' assessments were "stale [and] outdated." (Plaintiff's Brief at 6.)

The ALJ found that Mullins had the residual functional capacity to perform light work that required no more than frequent balancing and stooping; that

required no more than occasional pushing and pulling with the left upper and lower extremities, use of foot and hand controls, reaching in all directions or handling on the left side, climbing of ramps and stairs, kneeling, crouching, crawling, exposure to moving mechanical parts, unprotected heights, temperature extremes, vibration and loud noise; that did not require reaching overhead or fingering on the left side or climbing ladders or scaffolds; that required him to perform no more than simple, routine tasks and to make simple work-related decisions; and that required only occasional changes in a routine work setting. (R. at 17.)

In making this residual functional capacity finding, the ALJ stated that he was giving "partial weight" to the opinions of the state agency consultants and Drs. Blackwell and Horton. (R. at 22.) The ALJ noted that the state agency physicians agreed initially and on reconsideration with the lifting abilities indicated by Dr. Blackwell and that Mullins had postural, environmental and manipulative limitations; however, they disagreed with the sitting and standing limitations indicated by Dr. Blackwell. (R. at 21-22, 88-90, 107-09, 770-71.) The ALJ also noted that he was giving "little weight" to the opinion of Dr. Azzo because it was unsupported by the medical record. (R. at 22.)

Without explanation, Dr. Blackwell opined that Mullins was limited to sitting for two to four hours and standing for one hour in an eight-hour workday, with positional changes every 15 minutes. (R. at 771.) Dr. Blackwell's own unremarkable exam of Mullins's spine and lower extremities does not support these limitations. (R. at 771.) Dr. Blackwell's examination revealed patella tenderness that prevented Mullins from squatting, but his gait was symmetrical and balanced, and his lower extremity strength and reflexes were intact. (R. at 771.) Mullins had no range of motion limitations in his spine, hips, knees or ankles. (R. at 774.) Dr. Blackwell's examination findings were consistent with the

musculoskeletal examinations conducted by Mullins's primary care providers at Haysi Clinic, which showed a normal gait and normal spine range of motion. (R. at 446, 449, 453.) Dr. Azzo reported that Mullins walked without a limp; he had full range of motion of the cervical spine with no point tenderness; he had full range of motion of the hips, knees and ankles; his motor sensory examination in both legs was normal; and his heel-to-toe gait was normal. (R. at 991-92.) Dr. Dahl reported that Mullins's bilateral lower extremities had full range of motion, he was able to rise from the seated position without difficulty and walk with a tandem gait. (R. at 789, 791-92, 890.) Dr. Azzo found no restrictions with respect to Mullins's ability to walk, stand or sit. (R. at 994.) Similarly, Dr. Horton stated in his July 27 and August 8, 2017, reports, that Mullins could not climb ladders, but indicated no limitations in sitting, standing or walking. (R. at 982, 996, 1001.) In addition, in 2016, x-rays of Mullins's left knee showed no abnormalities. (R. at 768.) Thus, I find that substantial evidence exists to support the ALJ's finding that Dr. Blackwell's opinion regarding Mullins's ability to stand, walk and sit was not entitled to significant weight.

I do not, however, find that substantial evidence exists to support the ALJ's weighing of the medical evidence regarding Mullins's left upper extremity limitations. As noted above, the ALJ found that Mullins could occasionally push and pull with his left upper extremity. (R. at 17.) In August 2014, x-rays of Mullins's left shoulder showed mild degenerative arthropathy of the glenohumeral and acromioclavicular joint. (R. at 454.) On January 4, 2016, Dr. Horton performed a left ulnar decompression procedure at the wrist and elbow, (R. at 756-58), and subsequent left ulnar nerve revision, decompression and anterior transposition with neurolysis was performed on November 4, 2016. (R. at 1004-05.) Both state agency physicians found that Mullins should never push and pull with his left upper extremity. (R. at 88, 107-08.) They also opined that Mullins

-15-

could occasionally use his left upper extremity for front and lateral reaching and handling and that he could never reach overhead or finger with his left upper extremity. (R. at 89, 109.)

In June 2017, Dr. Azzo reported that Mullins had decreased range of motion, loss of finger sensation and loss of full grip strength in his ring and little fingers. (R. at 992-93.) He also noted that Mullins's left shoulder had decreased range of motion and weakness, secondary to shoulder arthritis impingement syndrome. (R. at 991, 993.) Dr. Azzo opined that Mullins could return to work that did not require him to lift items weighing more than five pounds with his left upper extremity. (R. at 994.) In July and August 2017, Dr. Horton found that Mullins had a left upper extremity combined impairment of 40 to 50 percent. (R. at 996, 1000.) He permanently restricted Mullins to lifting, pushing, pulling, gripping and grasping of items weighing no more than two pounds with his left upper extremity. (R. at 996-97, 1001.) He also noted that Mullins could not perform forceful grasping with his left upper extremity. (R. at 982.) In addition, Fitzpatrick opined that Mullins had no ability to maintain grip strength or fine motor control. (R. at 964.) Notes from The Hand Center show that Mullins had weak grip and tip pinch strength in the left hand. (R. at 1228, 1233-34, 1239-40, 1283.) It also was noted that Mullins had a limited ability to grip due to pain. (R. at 1294.) In July 2016, Mullins complained of continued numbness in the ring and small fingers and tenderness at the left cubital tunnel area. (R. at 1085.) In September 2017, Dr. Dahl reported that Mullins had significant allodynia over the left elbow, forearm and pinky finger in the ulnar nerve distribution. (R. at 1301.)

It is well-settled that, in determining whether substantial evidence supports the ALJ's decision, the court must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his

rationale in crediting evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40. "[T]he [Commissioner] must indicate explicitly that all relevant evidence has been weighed and its weight." *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). "The courts … face a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

As noted above, the ALJ gave "partial weight" to the opinions of the state agency consultants and Drs. Blackwell and Horton and "little weight" to Dr. Azzo's opinion. (R. at 22.) While the ALJ noted Dr. Azzo's and Dr. Horton's restrictions placed on Mullins's ability to lift, he failed to address Mullins's limitations on pushing, pulling, gripping and grasping with his left upper extremity. (R. at 21-22.) While the ALJ noted these limitations in his decision, he failed to address these limitations in his findings other than finding that Mullins could occasionally push and pull with his left upper extremity. (R. at 22.) The ALJ's decision stated that he was giving "partial" weight to the opinions of the state agency physicians, who opined that Mullins could not push and pull with his left upper extremity. (R. at 22, 88, 107-08.) As noted above, the record shows that Mullins had decreased grip strength in his left hand, and his left shoulder had decreased range of motion and weakness secondary to shoulder arthritis and impingement syndrome. (R. at 993, 1228, 1233-34, 1239-40, 1283.) The ALJ failed to address Mullins's restrictions on gripping in his residual functional capacity findings, nor did he include this limitation in the hypothetical posed to the

vocational expert to determine what, if any, jobs existed that such an individual with Mullins's limitations could perform. Thus, I do not find that substantial evidence exists to support the ALJ's finding regarding Mullins's physical residual functional capacity.

Based on these findings, I will not address Mullins's remaining argument. An appropriate Order and Judgment will be entered remanding Mullins's claim to the Commissioner for further development.

DATED: August 19, 2020.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE